# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2147-24
                    A-2169-24

S.V.,[1]

       Plaintiff-Respondent,

v.

F.J.H.,

       Defendant-Appellant.

_____

F.J.H.,

       Plaintiff-Respondent,

v.

S.V.,

       Defendant-Appellant.

_____

Submitted May 19, 2026 – Decided July 17, 2026

---

[1] We use initials to preserve the confidentiality of domestic violence records, R. 1:38-3(d)(9), and initials and pseudonyms to protect the confidentiality of the victims, R. 1:38-3(d)(10).

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket Nos. FV-09-1691-24 and FV-09-1689-24.

Lazaro Carvajal, attorney for appellant in A-2147-23 and respondent in A-2169-24 (Ana Maria Meizys and Lazaro Carvajal, on the briefs).

Leopold Law, LLC, attorneys for appellant in A-2169-24 and respondent in A-2147-24 (Howard B. Leopold, on the briefs).

PER CURIAM

These appeals, calendared back-to-back and consolidated for purposes of issuing a single opinion, arise from cross-complaints alleging violations of the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Following a five-day joint trial on both complaints, on February 5, 2025, the Family Part judge issued final restraining orders (FRO) to S.V. (Sara) against F.J.H. (Fred), and Fred against Sara. Before us, both parties appeal from the FROs entered against them. Based on our review of the record, we affirm the issuance of both FROs.

I.

By all accounts, the decade-long relationship between the parties was contentious. Never married, the parties share one child, C.H. (Charley), born in 2017.

The culmination of their ongoing issues, precipitating the filing of the dueling domestic violence complaints, arose on December 31, 2023. At that time, the parties resided together, but Sara was living in the basement bedroom of their shared home. Around midday, Fred entered the bedroom, the parties argued, and Fred took Sara's cell phone from the nightstand, contending Sara had ignored his previous request to return the phone to him.

In an attempt to retrieve her phone from Fred, Sara jumped on his back, and the parties fell onto the bed. Fred exited the basement. Home security cameras captured videos of Sara's hanging on Fred's leg as he ascended the stairs, and shoving Fred onto the living room couch while demanding he return her phone. Sara contacted police and left the home.

That same day, Sara filed a domestic violence complaint against Fred alleging he committed the predicate act of harassment when he grabbed her phone and "pushed her." Sara was issued a temporary restraining order (TRO).

A-2147-24

Prior to trial, Sara obtained an amended TRO, asserting a history of physical, emotional, and economic abuse.

On January 2, 2024, Fred filed his domestic violence complaint against Sara, alleging she was the aggressor during the December 31 incident, and was issued a TRO. In his complaint, Fred asserted Sara committed the predicate acts of assault and harassment.

Both parties were represented by counsel at their joint trial. Sara testified on her own behalf. She also presented the testimony of three witnesses – her classmate, friend, and neighbor – who largely corroborated Sara's testimony on three separate occasions predating the December 31 incident. Fred testified on his own behalf and did not call any witnesses. The trial judge also considered documentary evidence, including video footage from home cameras capturing the December 31 incident and photographs of Fred's injuries sustained at that time.

Sara testified she was born in Mexico, met Fred in 2012, while she was vacationing in New Jersey, and moved to the United States in 2015, with the intention of marrying Fred and starting a family. Unbeknownst to Sara, Fred was married to another woman.

4

Sara testified consistently with the allegations of her complaint. She asserted, during the December 31 incident, Fred pushed her when she asked him to return her phone. Sara claimed Fred hit her and choked her. Accordingly, Sara said she "defended [her]self by doing the same thing."

Sara also testified about the prior history of domestic violence between the parties. For example, Sara stated Fred made her flush the toilet after he used the bathroom and described instances during which Fred insulted her cooking and cleaning, making her "feel not useful." Sara also detailed examples of Fred's controlling behavior, including tracking her through her cell phone, dictating the cleaning products she could use, forbidding her from going to the gym, and threatening he would "throw [her] out on the street" when she refused to engage in sexual relations. Sara testified Fred "had a problem of alcoholism" and became aggressive when he drank. She further claimed Fred gave Charley alcohol when he was an infant.

Sara further testified, on January 10, 2024, while the TRO was in effect, Fred texted her asking "to talk to our son because a few days ha[d] gone by" without communication with Charley.

In response to her need for an FRO, Sara stated: "Because I am terrified of him. I am very afraid of him because he has destroyed my mental health, my

5

physical health, my financial [sic]. I am nobody here." Sara claimed she would live in fear without an FRO because "[Fred] hasn't shown any sign of peace. He has [sic] dedicated to destroy the mother of his son."

At the conclusion of Sara's testimony, the trial judge amended the complaint on the application of Sara's attorney and with consent of Fred's counsel, checking the box for the predicate act of contempt. The judge noted the narrative of the complaint reflected Fred violated the TRO by messaging her while it was in effect.

At the conclusion of Sara's case-in-chief, the hearing was adjourned and continued the following month. When trial resumed, prior to the presentation of Fred's case, Sara's attorney moved to amend her complaint to include the predicate act of criminal sexual contact. The trial judge denied the application, finding counsel had "ample opportunity . . . to amend or notify the court of that amendment." The judge noted defendant was entitled to notice to protect his right to due process. Sara's counsel countered Fred's rights were not violated because the criminal sexual contact predicate act was described in Sara's complaint even though the corresponding box was not checked. The judge was not persuaded.

6

Fred testified to a different version of the December 31 incident. Fred claimed he fell backward when Sara pulled him on the stairs and he "landed on [his] right elbow." Fred identified the photographs he took of his "scraped, bloodied, and bruised" elbow. Fred stated he took the phone from Sara's bureau because he had been asking her to return it to him "for months." We glean from Fred's testimony he rented the phone from a carrier that merged with another carrier. Fred testified the original carrier "would[ not] stop billing [him] until [he] returned the phone."

Fred also denied the allegations of prior domestic violence asserted by Sara and her witnesses. For example, Fred denied he gave Charley alcohol, insulted Sara, or made her flush the toilet for him. He further testified he never forced Sara to have sex with him. Fred acknowledged he refused to pay for her gym membership, but claimed he "didn't like the crowd at the gym."

Fred acknowledged he texted Sara on January 10, 2024. Reiterating a conversation he had with his lawyer, Fred testified counsel "said [he] recalled that the judge put on the record that we could have communication as long as that communication only pertained to the welfare of the child."[2]

---

[2] In response to the judge's warning to "stop [his] client" from disclosing "privileged information," Fred's attorney stated, "I waived that privilege. It's fine." But see N.J.R.E. 504(1) (providing, subject to certain exceptions not

A-2147-24

When questioned why he sought an FRO against Sara, Fred stated, "I have a son with her and I will have to deal with her for the rest of my son's life . . . . I'll always have to see her and I'll be afraid to be around her." He further stated Sara "had been volatile and violent, but not physically violent towards me. And now she actually put her hands on me." Following the close of all evidence, the judge reserved decision.

In a cogent oral decision, the trial judge found Sara and her witnesses credible. Conversely, the judge found Fred's testimony overall incredible, except for the December 31 incident, which was captured on home security cameras. Describing Fred as "smug and arrogant" the judge found his demeanor on "cross-examination was entirely evasive, non-responsive, and unreasonable." The judge also found Fred's explanations regarding prior incidents "were unreasonably dismissive."

Addressing Sara's allegations against Fred, the trial judge found Fred committed the predicate act of harassment under N.J.S.A. 2C:33-4(a) and (c) by taking Sara's phone as part of a continuing pattern of his controlling behavior.

---

relevant here, "communications between a lawyer and his [or her] client in the course of that relationship and in professional confidence, are privileged," and the client alone holds the right to waive the privilege (quoting N.J.S.A. 2A:84A-20)).

A-2147-24

To support his finding, the judge summarized the multiple incidents Sara detailed at trial. The judge found, ultimately during the December 31 incident, Fred "took the phone" to prevent Sara from communicating with her family and friends, "who all live[d] out of the country."

The trial judge also found the predicate act of contempt based on Fred's violation of Sara's TRO. According to the judge, "there was no emergency or reason to reach out to [Sara] to speak to their son. They had third parties that they could [have] communicate[d] with as to that issue."

Citing the history of abuse and Fred's controlling behavior, the judge determined an FRO was necessary to protect Sara from further harm. The judge noted "[Sara] genuinely fear[ed Fred]" and he had an "economic advantage over [her]."

Turning to Fred's complaint, the judge found Sara committed the predicate acts of assault, N.J.S.A. 2C:12-1(a), and harassment, N.J.S.A. 2C:33-4(b), during the December 31 incident. Although the judge recognized Sara "had enough of everything that happened to her" during the parties' relationship, "and lost it on [Fred]," the judge found Sara's response to Fred's conduct on that date was not "appropriate" and "went too far." The judge further found Fred's account was corroborated by the video footage. The judge found an FRO was

9

necessary to protect Fred from further harm given the parties' ongoing relationship as co-parents.

## II.

Our limited scope of review of a trial court's findings is well established. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). We "grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will not disturb the court's factual findings and legal conclusions "unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Ibid. It is axiomatic that the judge who observes the witnesses and hears the testimony has a perspective the reviewing court simply does not enjoy. See Pascale v. Pascale, 113 N.J. 20, 33 (1988). We also accord deference to the factual findings of Family Part judges because that court has "special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. However,

A-2147-24

"all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017).

The entry of an FRO under the PDVA requires the trial court make certain findings, pursuant to a two-step analysis. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The trial court should make this determination "in light of the previous history of violence between the parties." Ibid. (quoting Cesare, 154 N.J. at 402).

If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. Although the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)][(7)],[3] to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

Those factors include – but are not limited to – "[t]he previous history of domestic violence between the [parties], including threats, harassment and

---

[3] N.J.S.A. 2C:25-29(a)(7), became effective on January 8, 2024.

A-2147-24

physical abuse," N.J.S.A. 2C:25-29(a)(1), and "[t]he existence of immediate danger to person or property," N.J.S.A. 2C:25-29(a)(2).

## A. Fred's Appeal

Fred contends the trial judge erred in finding he committed harassment under N.J.S.A. 2C:33-4(a) and (c) because, by taking Sara's cell phone, he did not make a communication within the meaning of the harassment statute and he did not act with a purpose to harass Sara. Fred further claims the judge erroneously determined he committed contempt and Sara failed to establish she needed the protection of permanent restraints against him.

Harassment is a predicate act under N.J.S.A. 2C:25-19(a)(13). A person is guilty of harassment "if, with purpose to harass another," he or she:

> a. Makes, or causes to be made, a <u>communication or communications</u> anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in <u>any other course of alarming conduct</u> or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
>
> [N.J.S.A. 2C:33-4(a) to (c) (emphasis added).]

"'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)). "Although a purpose to harass can be inferred from a history between the parties, . . . that finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D. v. M.D.F., 207 N.J. 458, 487 (2011). A judge must consider "the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S., 175 N.J. at 326 (quoting Cesare, 154 N.J. at 404).

In the present matter, the trial judge concluded Fred violated subsections (a) and (c) of the harassment statute when he took Sara's phone "to continue to harass [Sara] and control [Sara]" and the intent to harass "[wa]s supported by the incident and a history of domestic violence that was testified to by [Sara] that [he] found credible."

We recognize, as Fred argues, the trial judge erroneously cited N.J.S.A. 2C:33-4(a) as a basis for finding he committed the predicate act of harassment. Subsection (a) of the harassment statute "proscribes a single act of communicative conduct when its purpose is to harass." Hoffman, 149 N.J. at

13

580. "The statute distinguishes between 'communications' and 'language' that violate the statute in subsection (a), and 'conduct' and 'acts' that do so in subsection (c)." State v. Burkert, 231 N.J. 257, 272 (2017). Because Fred's conduct in taking Sara's cell phone did not constitute communicative conduct, the record does not support a finding of harassment under subsection (a).

Nonetheless, the trial judge correctly determined Fred committed the predicate act of harassment under N.J.S.A. 2C:33-4(c). The purpose of subsection (c) of the harassment statute "is to reach conduct not covered by subsections (a) and (b)." Hoffman, 149 N.J. at 580. Here, the trial judge considered the competing testimony adduced by the parties, credited Sara's testimony, and found Fred's conduct in taking Sara's phone constituted a continuing course of control under N.J.S.A. 2C:33-4(c). The record fully supports the judge's findings. As only one predicate act is required to find domestic violence, see Silver, 387 N.J. Super. at 125, we need not address whether defendant's conduct also constituted contempt.

Nor do we find any merit to Fred's contentions that Sara failed to demonstrate the need for an FRO. The trial judge addressed the factors set forth in N.J.S.A. 2C: 25-29(a)(1) to (7), and found a prior history of abuse between the parties. The judge credited Sara's testimony "she was fearful of [Fred's]

14

continuing his behavior of controlling abuse" and their relationship was ongoing as they shared a child together.

## B.  Sara's Appeal

Sara first contends the trial judge erroneously found the predicate act of assault because she did not intend to harm Fred.  Instead, Sara contends she intended to protect herself from further harm and Fred did not suffer any injuries.

Assault is a predicate act under N.J.S.A. 2C:25-19(a)(2).  Under N.J.S.A. 2C:12-1(a)(1), a person commits simple assault if he or she "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another."  N.J.S.A. 2C:11-1(a) defines "bodily injury" as "physical pain, illness or any impairment of physical condition."  "Not much is required to show bodily injury.  For example, the stinging sensation caused by a slap is adequate to support an assault."  N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997).

The record demonstrates on December 31, 2023, after Fred took Sara's cell phone, Sara physically engaged with him to retrieve the phone.  The trial judge found Sara "jumped on [Fred's] back to take the phone away and pushed him going up the stairs," then tried to drag him down the stairs.  The judge noted the incident was clearly captured on the home security cameras and Fred's

15

injuries were depicted in his photographs. We discern no error in the judge's conclusion Sara "went too far" and "committed simple assault under the statute." As only one predicate act is required to find domestic violence, see Silver, 387 N.J. Super. at 125, we need not address whether Sara's conduct also constituted harassment under N.J.S.A. 2C:33-4(b).

We also reject Sara's argument Fred failed to demonstrate the need for an FRO. "When the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 127). A single predicate act involving the use of physical force or violence is sufficient to grant an FRO if there is a chance of immediate or continuing danger. See McGowan v. O'Rourke, 391 N.J. Super. 502, 506 (App. Div. 2007).

In finding Fred's need for an FRO, the trial judge emphasized the predicate act of assault committed by Sara and the parties' ongoing relationship because they share Charley. Thus, there was substantial credible evidence in the record establishing the issuance of an FRO was necessary "to protect [Fred] from an immediate danger or to prevent further abuse." See Silver, 387 N.J. Super. at 127.

Finally, we are not persuaded by Sara's renewed assertion that the trial judge improperly denied her motion to amend her domestic violence complaint to include sexual assault as a predicate act. Pursuant to our discretionary standard of review, see Grillo v. State, 469 N.J. Super. 267, 275 (App. Div. 2021), we conclude the judge properly weighed Fred's right to due process, see T.M.S. v. W.C.P., 450 N.J. Super. 499, 505 (App. Div. 2017). As the judge recognized, Sara's application to amend her complaint was made long after she rested her case. In any event, as we have stated, only one predicate act is necessary for a domestic violence finding.

\* \* \* \*

In summary, we conclude the evidence adduced at the joint trial satisfied both prongs of the Silver analysis and fully supported issuance of both FROs. Given our deferential standard of review, we discern no basis to disturb the judge's decision on each application. To the extent not specifically addressed, the parties' remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

17